MARK A. PERRY (SBN 212532)
  mperry@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

JASON C. LO (SBN 219030)
  jlo@gibsondunn.com
JENNIFER J. RHO (SBN 254312)
  jrho@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  213.229.7000
Facsimile: 213.229.7520

*Attorneys for Defendant Apple Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AliveCor, Inc.,<br><br>                    Plaintiff,<br><br>        v.<br><br>Apple Inc.,<br><br>                    Defendant. | CASE NO. 4:21-CV-03958-JSW<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Date:         September 3, 2021<br>Time:        9:00 a.m.<br>Place:       Courtroom 5, 2nd Floor<br><br>The Honorable Jeffrey S. White |

Gibson, Dunn &
Crutcher LLP

## SUMMARY OF ARGUMENT

After releasing and benefitting from various ECG-capable devices and apps that it has built to work with and on the Apple Watch, iPhone, and Android smartphones, AliveCor now accuses Apple of anticompetitive conduct because Apple's updates to its own Apple Watch and watchOS purportedly made it more difficult for AliveCor's products to utilize Apple Watch data. This does not give rise to plausible antitrust claims for the following reasons:

1. AliveCor does not plead plausible antitrust product markets. Its three proposed hardware markets fail to include reasonable substitutes (including AliveCor's own products) and in some cases include non-ECG products, and thus are too narrow and too broad. Its two proposed app markets likewise are inadequately defined: they exclude reasonable substitutes, have vague boundaries, and provide no basis for watchOS being a standalone product market. *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (market must include "product at issue" and "economic substitutes").

2. AliveCor makes unsupported market share allegations that fail to establish that Apple holds market power in the proposed markets. At most, AliveCor presents a 37.5% market share in a single quarter, which fails to "establish a prima facie case of market power." *Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997). AliveCor's attempt to increase that market share is based only upon unsupported assumptions and implausible interpretations of third-party articles. *See FTC v. Facebook, Inc.* – F. Supp. 3d. --, 2021 WL 2643627, at *12 (D.D.C. 2021).

3. AliveCor generally fails to state an antitrust claim. AliveCor's claims accuse an Apple product design improvement itself as anticompetitive conduct, without separate, associated anticompetitive conduct. Even assuming Apple were a monopolist in a relevant product market, which it is not, it is an "uncontroversial proposition that product improvement by itself does not violate Section 2, even if it is performed by a monopolist and harms competitors as a result." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F. 3d 991, 998-1000 (9th Cir. 2010).

4. AliveCor's § 17200 claim has no independent basis and should be dismissed along with the Sherman Act claims for the reasons stated above. *See Aguilar v. Atlantic Richfield.*, Cal. 4th 826, 866-867 (Cal. 2000).

Gibson, Dunn &
Crutcher LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ................................................................... 1

II. ALIVECOR'S ALLEGATIONS ................................................................ 3

III. LEGAL STANDARD............................................................................. 4

IV. ARGUMENT ......................................................................................... 5

    A.    AliveCor Fails to Allege Plausible Product Markets ..................................... 5

        1.    AliveCor's Proposed Hardware Markets Are Too Narrow and Too Broad........................................................................ 6

        2.    AliveCor's Proposed Heart Rate Analysis App Markets Are Too Narrow ................................................................... 9

    B.    AliveCor Fails to Plead that Apple Has Sufficient Market Share in the Relevant Markets ................................ 11

    C.    AliveCor Has Not Plausibly Alleged Anticompetitive Conduct................................ 14

    D.    AliveCor's Unfair Competition Claim Has No Independent Basis ........................... 15

V. CONCLUSION ....................................................................................... 15

MOTION TO DISMISS COMPLAINT
CASE NO. 4:21-CV-03958

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Aguilar v. Atlantic Richfield Co.,*
     25 Cal.4th 826 (2001) ............................................................................................3, 15

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP,*
     592 F.3d 991 (9th Cir. 2010)....................................................................................3, 14

*Ashcroft v. Iqbal,*
     556 U.S. 662 (2009) .........................................................................................................5

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
     472 U.S. 585........................................................................................................................3

*Bell Atl. Corp. v. Twombly,*
     550 U.S. 544 (2007) ..............................................................................................2, 3, 5

*Epic Games, Inc. v. Apple Inc.,*
     493 F. Supp. 3d 817 (N.D. Cal. 2020) ...............................................................3, 9

*FTC v. Qualcomm Inc.,*
     969 F.3d 974 (9th Cir. 2020).......................................................................................5

*Foremost Pro Color, Inc. v. Eastman Kodak Co.,*
     703 F.2d 534 (9th Cir. 1983).....................................................................................15

*In re Gilead Scis. Sec. Litig.,*
     536 F.3d 1049 (9th Cir. 2008)....................................................................................5

*Glen Holly Ent., Inc. v. Tektronix Inc.,*
     343 F.3d 1000 (9th Cir. 2003), *opinion amended on denial of reh'g,* 352 F.3d 367
     (9th Cir. 2003).....................................................................................................................7

*Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.,*
     No. C-09-3854 MMC, 2010 WL 1541257 (N.D. Cal. Apr. 16, 2010), *aff'd,* 433
     Fed. App'x 598 (9th Cir. 2011)................................................................................6

*Hicks v. PGA Tour, Inc.,*
     897 F.3d 1109 (9th Cir. 2018).............................................................2, 3, 5, 6, 7, 8, 10

*High Tech. Careers v. San Jose Mercury News,*
     996 F.2d 987 (9th Cir. 1993).......................................................................................8

*hiQ Labs, Inc. v. LinkedIn Corp.,*
     485 F. Supp. 3d 1137 (N.D. Cal. 2020) ............................................................5, 7

*Image Technical Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ........................................................................................12, 13

*FTC v. Facebook, Inc.*,
   – F. Supp. 3d. – , 2021 WL 2643627 (D.D. C. 2021) ..............................................11, 12, 13

*Korea Kumho Petrochemical v. Flexsys Am. LP*,
   Case No. 07-1057, 2008 WL 686834 (N.D. Cal. Mar. 11, 2008) ........................................11

*Lambtek Yogurt Machines v. Dreyer's Grand Ice Cream, Inc.*
   Case No. 96-20959, 1997 WL 108718 (N.D. Cal. Mar. 3, 1997) ........................................10

*Lucent Technologies, Inc. v. Gateway, Inc.*,
   Case No. 02-2060-B (CAB), 2007 WL 2900484 (S.D. Cal. 2007) .....................................10

*MetroNet Servs. Corp. v. Qwest Corp.*,
   383 F.3d 1124, 1130-31 (9th Cir. 2004) .............................................................................14

*Newcal Industries, Inc. v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) ............................................................................................6, 7

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ...........................................................................................................5

*Pacific Bell Telephone Co. v. Linkline Commc'ns, Inc.*,
   555 U.S. 438, 450 (2009) .....................................................................................................15

*Pistacchio v. Apple, Inc.*,
   Case No. 4:20-cv-07034-YGR, 2021 WL 949422 (N.D. Cal. Mar. 11, 2021) ...................9

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) .....................................................................................3, 5, 7, 10

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ...............................................................................................13

*RLH Industries, Inc. v. SBC Commc'ns, Inc.*,
   133 Cal. App. 4th 1277 (2005) ............................................................................................15

*Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.*,
   637 F.2d 1376 (9th Cir. 1981) .............................................................................................10

*Sayre v. Google, Inc.*,
   Case No. C 19-02247 WHA, 2019 WL 6036703, at *3 (N.D. Cal. Nov. 14, 2019) ...........14

*SmileCare Dental Group v. Delta Dental Plan of California, Inc.*,
   88 F.3d 780 (9th Cir. 1996)....................................................................................................5

*Somers v. Apple, Inc.*,
   729 F.3d 953 (9th Cir. 2013)...................................................................................................7

1
2

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001)..........................................................................................5

3

*Twin City Sportservice, Inc. v. Charles O. Finley & Co. Inc.*,
    512 F.2d 1264 (9th Cir. 1975).....................................................................................12

4
5

*United States v. Aluminum Co. of Am.*,
    148 F.2d 416 (2d Cir. 1945).........................................................................................13

6
7

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)........................................................................................................5

8

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)......................................................................................................14

9
10

**Other Authority**

P. Areeda & H. Hovenkamp, Fundamentals of Antitrust Law
    § 15-11[D] (2019-2 Supp.). ...........................................................................................5

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on September 3, 2021, at 9:00 a.m., or as soon thereafter as the matter may be heard, in the U.S. District Court for the Northern District of California, Courtroom 5, 2nd Floor, Federal Courthouse, Defendant Apple Inc., through their undersigned counsel, will, and hereby do, move to dismiss Plaintiff AliveCor, Inc.'s Complaint for failure to state a claim upon which relief can be granted. This Motion is supported by this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the accompanying Request for Judicial Notice; the [Proposed] Order filed herewith; the pleadings and papers on file herein; and such other matters that may be presented to the Court at the hearing.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

Defendant Apple Inc. ("Apple") respectfully submits this Memorandum of Points and Authorities in support of its Motion to Dismiss Plaintiff AliveCor, Inc.'s ("AliveCor") Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

**STATEMENT OF ISSUES TO BE DECIDED**

Does the Complaint fail to state a claim for which relief can be granted under the Sherman Act, or the California Unfair Competition Law, and therefore require dismissal of all claims, because:

1. AliveCor did not plead a plausible relevant product market;

2. AliveCor failed to plead Apple holds a sufficient market share in the relevant markets; or

3. AliveCor failed to state an antitrust claim.

**I.      PRELIMINARY STATEMENT**

Initially released in 2015, the Apple Watch provided consumers a way to use their smartphone features on the go, along with a host of health and fitness related features unique to the Watch. The Apple Watch has undergone upgrades and improvements over time, including approval of its Series 4 model by the FDA to record ECGs.

Until recently, AliveCor has taken advantage of Apple Watch (and iPhone) software, hardware, and customer bases in order to develop apps and devices to track and analyze users' heart rates, including the portable, ECG-capable KardiaMobile and KardiaBand devices that work with the iPhone and Apple Watch respectively. Complaint, ECF 1 ("Compl."), ¶ 20 n. 9; *see also* Decl. of Jennifer Rho

ISO Def's Req. for Judicial Notice ("RJN"), Ex. C. Indeed, AliveCor appears to concede that Apple's conduct was *not* anticompetitive or exclusionary for much of the Apple Watch's history. AliveCor's lengthy factual allegations boil down to a complaint about one of Apple's latest Apple Watch improvements: that an update of the heart rate algorithm with the Series 4 Apple Watch made it difficult for AliveCor to offer one specific functionality—using heart rate data to encourage a user to take an ECG—not offered by Apple itself. But companies are generally under no obligation to provide their assets for use by another and so, even if true, Apple's actions would not constitute an antitrust violation.

AliveCor compounds its failure to plead a plausible claim for relief by failing to present an appropriate market in which Apple holds market power or a monopoly and purportedly committed that anticompetitive conduct. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) (requiring a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face"). AliveCor pleads two sets of markets, each with alternative constructions, and all of which are implausibly overbroad and/or narrow. First, AliveCor alleges a hardware-based market with two alternative constructions: "the U.S. ECG-capable smartwatch market (or, in the alternative, the U.S. ECG-capable wearable devices market or U.S. smartwatch market)." Compl., ¶ 99. Second, AliveCor also alleges a "market for watchOS heart rate analysis apps or, in the alternative, heart rate analysis apps for wearable devices." *Id.*, ¶ 95.

These proposed market definitions do not, as they must, "encompass the product at issue as well as all economic substitutes for the product." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018). AliveCor's hardware-based market definitions are each limited to wearable or smartwatch devices. But according to AliveCor, various factors affect the development of and demand for ECG-capable devices: "a user concerned with the ability to meaningfully diagnose any heart rate issues in real time can only choose a device that is capable of taking ECG readings." At the same time, AliveCor's proposed "U.S. smartwatch market" would encompass devices that are *not* ECG-capable. Nor does AliveCor address why a non-wearable ECG-capable device, or one not paired with a smartwatch, is not an economic substitute for a user concerned with "medically determin[ing] whether they are experiencing a heart-related event requiring medical assistance." Compl., ¶ 34.

AliveCor's proposed app market definitions fare no better. As its primary proposed market, AliveCor claims that watchOS heart rate analysis apps constitute their own market. But "such single-

Gibson, Dunn &
Crutcher LLP

brand markets are, at a minimum, extremely rare and courts have rejected such market definitions even where brand loyalty is intense." *Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817, 835 (N.D. Cal. 2020) (internal alterations and citations omitted). AliveCor's alternative market—all heart rate analysis apps—is likewise impermissibly narrow, excluding reasonable substitutes for consumers. AliveCor cannot draw up artificial markets contorted to meet its litigation needs which do not encompass all interchangeable products. *See Hicks*, 897 F.3d at 1121; *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).

AliveCor also fails to plead that Apple has sufficient market power in these markets while the alleged anticompetitive conduct has occurred. AliveCor relies upon a contorted reading of a few tech news articles, limited data collected during the COVID-19 pandemic, and unsupported assumptions about Apple's competitors in order to craft a purported market share data point for a single quarter in 2020. AliveCor's claims regarding Apple's market power in the heart rate analysis app markets are based on the same faulty allegations, and fail to take into account any other heart rate analysis apps. Such allegations are not "enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Twombly,* 550 U.S. at 555.

Fundamentally, AliveCor's claims accuse Apple's product design improvement as being anticompetitive, without separate, associated anticompetitive conduct. However, it is an "uncontroversial proposition that product improvement by itself does not violate Section 2, even if it is performed by a monopolist and harms competitors as a result." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 999-1000 (9th Cir. 2010).

Finally, because AliveCor's Unfair Competition Law claim is predicated on the same allegations and theories as the Sherman Act claim, it must fail for the same reasons as AliveCor's antitrust claims. *See e.g.*, *Aguilar v. Atlantic Richfield Co.*, 25 Cal.4th 826, 866-867 (Cal. 2001).

## II.    ALIVECOR'S ALLEGATIONS

Since first released, the Apple Watch has been equipped with a number of health features and included a photoplethysmography ("PPG") sensor to help monitor users' heart rate. Compl., ¶ 1. Apple has continued to improve and update the health features in new generations of the Apple Watch and watchOS. *Id.*, ¶¶ 7, 78. For example, Apple added the ability to record an ECG and a new

heart rate analysis app to the Series 4 Watch, although Apple to this day also offers Watches that do not have ECG capability, including the Series 3 Watch, which starts at half of the price of later Series Watches like the Series 5. *Id.*, ¶ 21, n.10 (RJN, Ex. A); ¶ 40 n.19 (RJN, Exs. D-E).

Two years after Apple first introduced the Apple Watch, AliveCor obtained FDA approval to sell its KardiaBand, an ECG-capable wristband designed to be worn with the Apple Watch. *Id.*, ¶ 7, 20 n.9 (RJN, Ex. C). AliveCor also developed the SmartRhythm app, which "monitor[s] a user's heartrate and alert[s] them when there was some irregularity suggesting they should record an ECG." Compl., ¶ 2. AliveCor has utilized the Apple Watch's heart rate algorithm in order to develop its KardiaBand wristband and iOS-compatible apps and reach Apple's consumers, while simultaneously developing an AndroidOS compatible app. *Id.*, ¶ 2. AliveCor's KardiaBand and apps, including the Kardia app that remains available for free in Apple's App Store, add to AliveCor's offering of portable, ECG-capable products that work with smartphones. *Id.*, ¶ 18, n.7 (RJN Ex. B); ¶ 20, n.9 (RJN Ex. C). AliveCor acknowledges that "Apple not only initially approved AliveCor's apps for distribution through the App Store, but also advertised AliveCor's innovations in order to sell more Apple Watches." Compl., ¶ 2. AliveCor also admits: "Apple's demonstrated commitment to heart health on the Apple Watch validated AliveCor's business concept and, as healthy competition should do, initially led to an increase in AliveCor's sales and public brand awareness." *Id.*, ¶ 3.

With its Series 4 Watch, Apple added to the various options already available to consumers for analyzing their heart rate: AliveCor's apps, KardiaMobile, and/or KardiaBand; other third-party heart rate analysis apps utilizing Apple Watch or other hardware data that were available on watchOS; and other hardware devices able to measure heart rate and ECG that are sold by Fitbit, Garmin, and Android manufacturers, among others. *Id.*, ¶¶ 6, 31-35. But even though users now have more access than ever to sophisticated, portable, and affordable devices for analyzing heart rate and ECG information, AliveCor filed the Complaint in the present case on May 25, 2021, alleging violations of Section 2 of the Sherman Act and unfair competition.

### III.     LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter "to 'state a claim to relief that is plausible on its face.'"

MOTION TO DISMISS COMPLAINT
CASE NO. 4:21-CV-03958

Gibson, Dunn &
Crutcher LLP

1  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial

2  plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

3  inference that the defendant is liable for the misconduct alleged." *Id.* Applying this standard is a

4  "context-specific task that requires the reviewing court to draw on its judicial experience and

5  common sense." *Id.* at 679. The Court need not "accept as true allegations that contradict matters

6  properly subject to judicial notice." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)

7  (internal quotation marks and citation omitted). "Nor is the court required to accept as true allegations

8  that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v.*

9  *Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

10  ## IV. ARGUMENT

11  ### A.    AliveCor Fails to Allege Plausible Product Markets

12  To state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must allege:

13  "(1) Possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of

14  that power; and (3) causal antitrust injury." *SmileCare Dental Group v. Delta Dental Plan of*

15  *California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996). Defining the relevant market is the "threshold" for

16  stating Section 2 claims. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (citing *Ohio v. Am.*

17  *Express Co.*, 138 S. Ct. 2274, 2285 (2018)). "[T]he relevant market must still be plausibly alleged to

18  make it past a 12(b)(6) challenge." *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1147 (N.D.

19  Cal. 2020); *Hicks*, 897 F.3d at 1120 (noting that a product market "must encompass the product at issue

20  as well as all economic substitutes for the product").

21  An antitrust market consists of products "that have reasonable interchangeability for the

22  purposes for which they are produced," such that customers would switch from one product to another

23  if faced with a price increase. *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 404

24  (1956). "Most courts correctly define the presumptive market to include similar products, even though

25  they can be differentiated by brand or features." P. Areeda & H. Hovenkamp, Fundamentals of Antitrust

26  Law § 15-11[D] (2019-2 Supp.). Dismissal is appropriate when a plaintiff "alleges a proposed relevant

27  market that clearly does not encompass all interchangeable substitute products." *Queen City*, 124 F.3d

28  at 436–37 (citing cases); *see also, e.g.*, *Hicks*, 897 F.3d at 1121. Courts also may reject a market

definition "contorted to meet [plaintiff's] litigation needs." *Id.* at 1121; *Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.*, No. C-09-3854 MMC, 2010 WL 1541257, at *2 (N.D. Cal. Apr. 16, 2010), *aff'd*, 433 Fed. App'x 598 (9th Cir. 2011) (dismissal appropriate where plaintiff does not define "relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products") (internal quotations and citation omitted).

AliveCor points to two relevant markets—a hardware-based one for wearables, and one for heart rate analysis apps—as well as alternatives within each market. However, none of the proposed market definitions are legally tenable.

### 1.    AliveCor's Proposed Hardware Markets Are Too Narrow and Too Broad

AliveCor pleads three alternative hardware-based markets: (1) ECG-capable smartwatches, (2) all smartwatches, or (3) all ECG-capable wearable devices. Compl., ¶¶ 16, 45, 46. As an initial matter, these market definitions fail because they exclude AliveCor's own products. *Hicks*, 897 F.3d at 1120 (a market definition must "encompass the product at issue"); *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008). According to AliveCor, wearable devices constitute wristwatches and fitness trackers. Compl., ¶¶ 31-34. But AliveCor has developed multiple ECG-capable products that are not wearable and are instead designed to work with smart*phones* (not smart*watches*). Compl., ¶ 20 n.9 (RJN, Ex. C). AliveCor promotes its KardiaMobile device—a portable ECG reader that is designed to work with a smartphone, and is not a smartwatch or a wearable device—as a mobile ECG-capable device option. *Id.* ("AliveCor's KardiaBand and KardiaMobile enable people and their care teams to easily, quickly and inexpensively detect and manage possible abnormal heart rhythms."). Indeed, AliveCor describes the KardiaMobile as "FDA-cleared" and "the most clinically validated mobile EKG solution on the market[,] … recommended by leading cardiologists and used by people worldwide for accurate EKG recordings." *Id.* Likewise, AliveCor's KardiaBand was a wrist*band* for the Apple Watch that was capable of recording an ECG. *Id.*, ¶ 2. It is not an ECG-capable smartwatch, or smartwatch in general, and must be worn with the Apple Watch to function. The KardiaBand is best categorized as an accessory to a smartwatch and would complement, but not compete in, a market for wearable or smartwatch devices. An injured party, however, must "be a

MOTION TO DISMISS COMPLAINT
CASE NO. 4:21-CV-03958

1    participant in the same market as the alleged malefactors." *Glen Holly Ent., Inc. v. Tektronix Inc.*, 343

2    F.3d 1000, 1008 (9th Cir.), opinion amended on denial of reh'g, 352 F.3d 367 (9th Cir. 2003) (internal

3    citation and quotation marks omitted); *Somers v. Apple, Inc*., 729 F.3d 953, 963 (9th Cir. 2013).

4         AliveCor's primary definition is further flawed because it focuses exclusively on a narrow

5    swath of consumers who want both ECG functionality and a smartwatch, and concludes without any

6    support there are no other substitutes. *Id.*, ¶¶ 31, 33, 34, 36. In so doing, AliveCor has focused on one

7    function—a device's ability to take an ECG reading—and unilaterally declared that there is a class of

8    consumers who want a device with that functionality, as well as entirely *unrelated smartwatch*

9    *functions*, all in a single package. *Id.*, ¶ 30 ("[T]hose features provide users with smartphone-like

10   capabilities in a wearable device that is *also able to*, *inter alia*, monitor health characteristics")

11   (emphasis added). Such an unnatural and contorted market definition is not adequate to meet Rule

12   12(b)(6)'s plausibility standard. *See hiQ Labs, Inc.*, 485 F. Supp. 3d at 1147; *Hicks*, 897 F.3d at 1121.

13        In lieu of pleading support for this narrow and unique market, AliveCor simply describes

14   functionalities of ECG-capable smartwatches. Compl., ¶ 31; *id.*, ¶ 30 ("Smartwatches' broad

15   functionality (including the ability to use multiple types of apps and easily select between them), as

16   well as their touchscreen capabilities are the main driver of demand for the devices, because those

17   features provide users with smartphone-like capabilities in a wearable device that is also able to, inter

18   alia, monitor health characteristics."). Such allegations describe the features of products in this alleged

19   market; they do not describe why this is a plausible market, and why other products are not reasonably

20   interchangeable for ECG-capable smartwatches, much less of ECG devices in general. *See Newcal*

21   *Indus.*, 513 F.3d at 1045; *Queen City*, 124 F.3d at 437 ("Interchangeability implies that one product is

22   roughly equivalent to another for the use to which it is put; while there may be some degree of

23   preference for the one over the other, either would work effectively.").

24        AliveCor's "fail[ure] to define its proposed relevant market with reference to the rule of

25   reasonable interchangeability" is a fundamental problem. *Queen City*, 124 F.3d at 436–37. As

26   AliveCor's own products demonstrate, ECG functionality can be provided by numerous devices,

27   including portable ones (some of which can be paired with smartphones), that are neither wearable nor

28   designed to be paired with a smartwatch and therefore outside the proposed market definitions. Compl.,

¶ 44, n.20 (RJN, Ex. F) ("The Apple Watch's ECG app isn't your only option. Portable and home-based ECGs are becoming increasingly common."). AliveCor itself developed and promoted multiple *iPhone*-related products and apps with ECG capabilities. Compl., ¶ 18, n.7 (RJN, Ex. B) ("AliveCor expects to commercially launch its iPhone ECG case [] and wireless iCard…. AliveCor expects to offer a free iPhone app for patients, with a paid version for physicians. Sometime after the iPhone ECG case becomes commercially available, the company plans to launch the iCard, which works with other iOS and Android devices."). Even if one wants both ECG functionality as well as smartwatch functionality, AliveCor fails to plead why that need could not be met by purchasing both a (lower-priced) ECG device as well as a (lower-priced) smartwatch without ECG capability. *See Hicks*, 897 F.3d at 1120-21 (dismissing antitrust claim when relevant market ignored multiple ways of reaching consumers).

By ignoring interchangeability, AliveCor has neglected to address the most fundamental issues, including whether most users who buy ECG-capable smartwatches even use the ECG functionality. *See High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) (holding that a market "can be determined only after a factual inquiry into the commercial realities faced by consumers"). If they do not, then AliveCor's alleged relevant market would make no sense because the prices of ECG-capable smartwatches would be very much constrained by smartwatches or wearables without an ECG function. This is because users seeking functions such as improved GPS capabilities, connectivity to a smartphone, or increased battery life may obtain non-ECG-capable smartwatches or wearables that meet those needs.

AliveCor further alleges that users seeking functionality that analyzes heart rate irregularities are distinct from users seeking to generally track their heart rate, *id.*, ¶ 44, and that the market for ECG-capable devices is affected by the need for FDA approval. *Id.*, ¶ 51. But while a heart condition such as AFib, "the only heart issue the ECG app can detect," is a serious problem, it is probably not a widespread condition "among Apple Watch wearers." Compl., ¶ 44, n.20 (RJN, Ex. F) (indicating "adults aged 18 to 34 are buying smartwatches more than any other age demographic… [but] the majority of [people affected by AFib] are over the age of 65"). AliveCor's decision to ignore whether consumers purchase different wearables or smartwatches for different functionality (or purchase updated devices because of functionality unrelated to ECG capability) is particularly notable given its

Gibson, Dunn &
Crutcher LLP

assertion that the Apple Watch has undergone an evolution in its purpose and consumer demand. *See, e.g.*, Compl., ¶ 17, n.6 (RJN, Ex. A).

For these reasons, AliveCor's proposed wearable or smartwatch-based market definitions therefore necessarily result in *excluding* various product substitutes while *including* smartwatches without ECG capability that cannot be substitutes. AliveCor's first proposed alternative market of "U.S. smartwatches" would exclude a range of ECG products that can be used independently of, or in conjunction with a smartwatch, while including smartwatches that are *not* FDA-approved to monitor ECG nor have the capabilities or hardware to monitor ECG. This suggests that a smartwatch without ECG capability is somehow interchangeable for one with it. That, however, conflicts with AliveCor's assertion that "a user concerned with the ability to meaningfully diagnose any heart rate issues in real time *can only* choose a device that is capable of taking ECG readings." *Id.*, ¶ 34 (emphasis added).

AliveCor's second alternative relevant market of "ECG-capable wearable devices" fares no better. Though now limited to products with ECG capability, it continues to exclude portable ECG-capable medical devices that can be used by the "user concerned with the ability to meaningfully diagnose any heart rate issues in real time" and seeking an FDA-approved device. *Id.*, ¶¶ 34, 51. This market therefore would exclude non-wearable ECG devices that are likely substitutes, such as AliveCor's "FDA-cleared KardiaMobile." *Id.*, ¶ 20 n.9 (RJN, Ex. C).

### 2.     AliveCor's Proposed Heart Rate Analysis App Markets Are Too Narrow

AliveCor pleads two alternative markets for heart rate analysis apps: (1) watchOS heart rate analysis apps, or (2) all heart rate analysis apps. AliveCor claims heart rate analysis apps are distinct from other activity or health tracker apps and, further, that watchOS heart rate analysis apps constitute a separate market because Apple Watch users can only use watchOS apps. Compl., ¶¶ 41-42, 45.

In other words, AliveCor asserts a single-brand market, comprised of watchOS heart rate analysis apps. But AliveCor does not establish watchOS apps as a separate market. *See Epic Games*, 493 F. Supp. 3d 817; *Pistacchio v. Apple, Inc.*, Case No. 4:20-cv-07034-YGR, 2021 WL 949422, at *2 (N.D. Cal. Mar. 11, 2021) (granting motion to dismiss in part because "Pistacchio has not yet adequately pled that the relevant market should itself be limited to the iOS platform"); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.*, 637 F.2d 1376, 1378 (9th Cir. 1981) (rejecting market

definition limited to Fiat cars based on "unsubstantiated belief that for a sizeable number of customers only a Fiat will do"); *Lucent Technologies, Inc. v. Gateway, Inc.*, Case No. 96-20959, 2007 WL 2900484, at *16 (S.D. Cal. Oct. 1, 2007) (rejecting relevant market of "MPEG-2 compliant computers" where MPEG-2 was patented, yet "interchangeable with other technologies in the market"). Nor can it. As explained in *Lambtek Yogurt Machines v. Dreyer's Grand Ice Cream, Inc.*:

> Defendants are incapable of monopolizing the market for its own brand of product. A manufacturer has a natural monopoly in the sale and distribution of its own products. [Citations omitted] Such natural monopolies do not contravene antitrust laws.

Case No. 96-20959, 1997 WL 108718, at *3 (N.D. Cal. Mar. 3, 1997) (dismissing an antitrust claim alleging a single-brand market).

AliveCor argues that Apple Watch users can only use watchOS apps with an Apple Watch. But AliveCor acknowledges that there are numerous devices that offer heart rate analysis that compete with the Apple Watch, including Fitbit and Garmin. Compl., ¶ 31. AliveCor does not establish that an Apple Watch user would *not* also utilize a Fitbit, Garmin, or stand-alone device providing heart rate capability. Similarly, AliveCor fails to explain why watchOS apps are not interchangeable with other types of apps, such as iPhone or Android apps provided by Apple or third parties, that interact with other hardware such as Fitbit, Garmin, or other portable heart rate or ECG-capable devices.

AliveCor's proposed definition, which is focused on "apps," also ignores devices that can operate independently of either a smartwatch or a smartphone, such as a portable device with a display, that could provide ECG or heart rate analysis independent of any app or separate device. In short, AliveCor has impermissibly drawn up artificial markets contorted to meet its litigation needs. *See Hicks*, 897 F.3d at 1121. Its alleged relevant markets "clearly do[] not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Queen City Pizza*, 124 F.3d at 436. These markets are "legally insufficient and a motion to dismiss may be granted." *Id.*

Finally, AliveCor again describes the features of products in the alleged market rather than alleging what makes the product unique (i.e., not interchangeable) with other products. *See, e.g.*, Compl., ¶ 38; *Id.*, ¶ 40 ("A heartrate analysis app is also different than a heartrate tracking app, which is designed simply to keep track of certain aspects of a user's heartrate (usually, beats per minute) in order to assess general fitness and/or progress toward certain fitness goals."). Descriptions of product

1    features do not evidence reasonable interchangeability for heart rate analysis apps.

2    **B.    AliveCor Fails to Plead that Apple Has Sufficient Market Share in the Relevant Markets**

3              AliveCor's claims also should be dismissed because the Complaint fails to plead that Apple

4    holds a sufficient market share, and, by extension, market power, in any of the proposed relevant

5    markets. AliveCor purports to identify different market shares held by Apple in the hardware-based

6    and app-based markets, of approximately 70% and 100%, respectively. However, these alleged market

7    shares lack coherent factual support and cannot satisfy AliveCor's pleading burden. *See FTC v.*

8    *Facebook, Inc.* – F. Supp. 3d. – , 2021 WL 2643627, at *14 (D.D.C. 2021); *Korea Kumho*

9    *Petrochemical v. Flexsys Am. LP*, Case No. 07-1057, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11,

10   2008) (holding that "[a]lthough [p]laintiff need not necessarily quantify [defendant's] market share

11   with precision," the allegation that defendant "dominat[ed] . . . the [relevant] market" fell short of

12   requirement to "assert some facts in support of its assertions of market power").

13             AliveCor makes a predicate assumption that only Apple's competitors, and not Apple, sell non-

14   ECG-capable smartwatches or wearables. Compl., ¶ 50 (concluding Apple must have a higher market

15   share in ECG-capable smartwatches than all wearables because its "closest competitors only offer ECG

16   functionality on a subset of their smartwatches (and not their fitness trackers)"). But Apple did not

17   introduce ECG functionality until its Series 4 Apple Watch, and not every Apple Watch contains a

18   native ECG app or functionality. *Id.* ¶ 81. AliveCor has provided no factual support for determining

19   the proportion of Apple Watches—or Apple's competitors' smartwatches or wearables—that are ECG-

20   capable. Nowhere in its Complaint does AliveCor acknowledge that Apple has continued to offer

21   multiple different Watch models (Series 3, Series 4 or later), only some of which have built-in ECG

22   capability. *Id.*, ¶ 40 n.19 (RJN, Ex. D) (article comparing Apple Watch models and identifying ECG

23   app for the Apple Watch Series 4 or later); *id.*, ¶ 86 n.29 (RJN, Ex. L). But AliveCor's sources indicate

24   that sales of non-ECG-capable Series 3 watches are strong and growing. *Id.*, ¶ 49 n.22 (RJN, Ex. I)

25   (noting that by Q2 2020, there had been a "30% year-on-year growth for Apple Watch Series 3."); *id.*,

26   RJN, Ex. K ("Series 3 sales were also strong, growing around 30%").

27             Rather than take Apple's product line composition into account, AliveCor goes out of its way

28   to ignore it. AliveCor makes no effort to quantify how many Apple Watches sold are ECG-capable.

AliveCor also provides no basis for its claim that "[i]f one broadens the market to include all ECG-capable wearables, that market share does not appreciably change (i.e., does not dip below 70%), because non-smartwatch ECG-capable wearables constitute only a very small portion of sales in such an alternatively-defined market." *Id.*, ¶ 50. The Complaint does not purport to identify what other products are in this market, much less quantify Apple's market share in this nebulous market.

Instead, AliveCor bases a claim that Apple holds 68% U.S. market share for smartwatches on one Canalys report for Q2 2020. *Id.*, ¶ 49. But the Canalys report does not set out that data. Instead, it states that in Q2 2020, "Apple shipped approximately 37.6% of all wearable devices in North America, a category that includes both smartwatches and fitness trackers." *Id.*, ¶ 49 n.22 (RJN, Ex. I). AliveCor's 68% figure thus assumes, without support, that: (1) Apple's "closest competitors were Fitbit, Garmin, and Samsung"; (2) entities in the "Others" category of the Canalys report can be disregarded even without Canalys data identifying their product composition; (3) the shipments of all three of Fitbit, Garmin, and Samsung comprised "50% smartwatches and 50% fitness trackers" based on a comment about *only Fitbit's* sales; (4) Apple's market share for smartwatches can be doubled since it only sells smartwatches; and (5) Apple's sales in a single quarter can be representative of other quarters and other years. *Id.* This report does not provide a basis for determining Apple's ECG-capable market share, what non-smartwatch ECG-capable wearables exist, or their level of sales. *Id.*, ¶ 50.

AliveCor's unsupported assumptions fall short of plausibly establishing that Apple holds a market share high enough to establish market power to support its monopolization or attempted monopolization claims. *See Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish a prima facie case of market power."); *FTC v. Facebook, Inc.* – F. Supp. 3d. --, 2021 WL 2643627, at *12 ("To merely allege that a defendant firm has somewhere over 60% share of an unusual, nonintuitive product market—the confines of which are only somewhat fleshed out and the players within which remain almost entirely unspecified—is not enough."); *Twin City Sportservice, Inc. v. Charles O. Finley & Co. Inc.*, 512 F.2d 1264, 1274 (9th Cir. 1975) ("[W]hile 90% of the market 'is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four per cent would be enough; and certainly thirty-three per cent is not.'") (quoting *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945)).

1    At most, AliveCor presents a less than 40% market share for a single quarter, which fails to

2    "establish a prima facie case of market power" during the relevant time period. *Image Technical*, 125

3    F.3d at 1206.  AliveCor does not provide a basis to conclude that Apple's market share during one

4    quarter during the COVID-19 pandemic, which has caused lockdowns and potentially affected

5    consumer demand, is representative of purchasing trends in other periods. Compl., ¶ 49 n.21 (RJN, Ex.

6    H). Nor does AliveCor otherwise provide a basis for estimating Apple's market share in other quarters.

7    *FTC v. Facebook, Inc.*, 2021 WL 2643627, at *12 (holding that "allegations [] which do not even

8    provide an estimated actual figure or range for [defendant's] market share at any point over the past

9    ten years [] ultimately fall short of plausibly establishing that [defendant] holds market power").

10   AliveCor also does not plead that "competitors are unable to expand their output in response to

11   supracompetitive pricing," a characteristic of markets where a lower market share was found to support

12   an attempted monopolization claim. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir.

13   1995) (addressing a 44% market share).

14   These same faulty assumptions infect AliveCor's contention that Apple holds dominant market

15   shares in watchOS heart rate analysis apps and heart rate analysis apps for all wearable devices. *See*

16   Compl., ¶¶ 8, 52-53. AliveCor bases these market share numbers on a claim that Apple has "dominance

17   of wearable devices capable of providing heartrate analysis." *Id.*, ¶ 53. But AliveCor proffers no

18   support for extrapolating a proposed ECG-capable wearable market share to a heart rate analysis app

19   market share. Even if one accepts watchOS heart rate analysis apps as the appropriate market (which

20   it is not), AliveCor provides no evidence of Apple's share of watchOS apps or of third party watchOS

21   apps for heart rate analysis. AliveCor also provides no facts that can be used to calculate market share

22   for more general tracker apps or non-watchOS apps, such as non-Apple heart rate analysis apps for

23   wearable devices other than the Apple Watch. AliveCor's only purported support is an assertion that

24   Apple's market share must be nearly 100% because "it has positioned itself as gatekeeper for watchOS

25   devices due to its control over watchOS distribution." *Id.*, ¶ 52. AliveCor's proffered allegations do not

26   allow the court to make a plausible inference that Apple holds a dominant market share in AliveCor's

27   proposed markets.

28

Gibson, Dunn &
Crutcher LLP

## C.    AliveCor Has Not Plausibly Alleged Anticompetitive Conduct

AliveCor's antitrust claims target Apple's update of its own heart rate algorithm used in its own Apple Watch products. Compl., ¶¶ 6-8, 102, 118. This, however, is not a basis for an antitrust claim. Despite conclusorily alleging that the change was not a product improvement, *id.*, ¶ 86, AliveCor pleads that Apple's heart rate algorithm update occurred as part of an improved product design that was reviewed and approved by the FDA. *Id.*, ¶¶ 6-7, 82. This included Apple offering *additional* functionalities of a new heart rate analysis app and the ability to record an ECG as a default app with the Series 4 Watch's hardware and software. *Id.* The "courts are properly very skeptical about claims that competition has been harmed by a dominant firm's product design changes." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 998 (9th Cir. 2010). "[A] design change that improves a product by providing a new benefit to consumers does not violate Section 2 absent some associated anticompetitive conduct." *Id.* at 998-99.

Here, AliveCor accuses Apple's product improvement as the purported abuse, because it purportedly affected whether AliveCor would be able to "predict irregular heart rate situations" using Watch-generated data, in order to suggest "a user should take an ECG."[1] Compl., at ¶¶ 6-8, 80, 85; *Tyco*, 592 F.3d at 1002 ("Thus, the product improvement at issue in this case, not some associated conduct by Tyco, caused the incompatibility."). AliveCor does not establish that Apple engaged in associated anticompetitive conduct. Indeed, AliveCor does not even establish that Apple and AliveCor compete on the relevant functionality. AliveCor does *not* allege that Apple has ever offered or currently offers a competing product that "assesses when [heart rate irregularities] likely indicated that the user should record an ECG to check on their heart health." Compl., ¶ 80. Nor does AliveCor

---

[1] AliveCor's argument is an attempt to plead anticompetitive conduct under the criticized "essential facilities" doctrine. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004). As a threshold matter, a facility is "essential" "only if it is 'otherwise unavailable and cannot be reasonably or practically replicated.'" *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130–31 (9th Cir. 2004). AliveCor's Complaint affirmatively establishes it has multiple alternative methods of receiving the information that it asserts it requires, including its own FDA-approved, ECG-capable products and as well as the available devices from Fitbit and Garmin that it mentions. Compl., ¶¶ 20 n.9, 34, 71-72, 76, 80; *see also* RJN, Ex. C. These products defeat AliveCor's essential facilities claim and, accordingly, present an independent basis for dismissing the Complaint for failure to plead anticompetitive conduct. *See Sayre v. Google, Inc.*, No. C 19-02247 WHA, 2019 WL 6036703, at *3 (N.D. Cal. Nov. 14, 2019) ("Google Play is not essential because RDevice could reach consumers by employing potential alternative channels of distribution.").

argue that Apple is using data (allegedly withheld from third parties) to offer a functionality that third parties no longer are able to offer. Instead, AliveCor's core complaint is that Apple eliminated AliveCor's ability to offer a functionality with which Apple has *never* competed. *Id.,* ¶¶ 80-89.

Apple Watches sales also do not supply the requisite associated anticompetitive conduct. AliveCor contends that Apple "implicitly condition[s] the sale of an Apple Watch to the use of its heartrate analysis app ….[and] the user not using a third party developer's heartrate analysis app." *Id.,* ¶¶ 107-08. But AliveCor does not establish that users actually use an Apple heart rate analysis app in lieu of third party heart rate analysis apps, that Apple has rejected all third party developer heart rate analysis apps, or that there are no third party heart rate analysis apps currently available to Apple Watch users. AliveCor also does not plead that AliveCor has been unable to put multiple apps on the Apple App Store because they all were rejected by Apple, that it has no apps presently available on the Apple App Store, or that AliveCor faces anticompetitive conduct because it sells its apps in a manner that entails payment of a commission to Apple. Nor does AliveCor contend Apple Watch sales block AliveCor from continuing to sell products, such as the KardiaMobile, that can collect heart rate data themselves (or that AliveCor has stopped selling those products, as it cannot).

AliveCor thus has failed to state an antitrust claim. Even if Apple were a monopolist (and it is not), under Section 2, it "has the right to redesign its products to make them more attractive to buyers." *Tyco,* 592 F.3d at 999 (quoting *Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 545 (9th Cir. 1983)). This is consistent with the general principle that "a firm has no antitrust duty to deal with its competitors . . . under terms and conditions that the rivals find commercially advantageous." *Pacific Bell Telephone Co. v. Linkline Commc'ns, Inc.,* 555 U.S. 438, 450 (2009).

**D.     AliveCor's Unfair Competition Claim Has No Independent Basis**

AliveCor's Unfair Competition Law claim is predicated on the same allegations and theories as the Sherman Act claim. Since AliveCor's antitrust claims are irreparably flawed, its § 17200 claim must fail as well. *Aguilar,* 25 Cal.4th at 866-67 (no § 17200 claim where predicate antitrust law claim dismissed); *RLH Industries, Inc. v. SBC Commc'ns, Inc.*, 133 Cal. App. 4th 1277, 1286 (2005).

**V.     CONCLUSION**

Apple thus respectfully requests that the Court dismiss the Complaint with prejudice.

1    DATED:  July 16, 2021                    GIBSON, DUNN & CRUTCHER LLP

2                                             By:  _____/s/ *Jason C. Lo*_____

3                                                        Jason C. Lo

4                                             *Attorney for Defendant Apple Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

## **CERTIFICATE OF SERVICE**

I, Jason C. Lo, certify that on July 16, 2021, the foregoing **DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS COMPLAINT** was filed with the Clerk of the Court via CM/ECF. Notice of this filing will be sent electronically to all registered parties by operation of the Court's electronic filing systems.

DATED: July 16, 2021                                    By:   /s/ *Jason C. Lo*
                                                                          Jason C. Lo