QUINN EMANUEL URQUHART & SULLIVAN, LLP
Sean Pak (Bar No. 219032)
seanpak@quinnemanuel.com
Adam Wolfson (Bar No. 262125)
adamwolfson@quinnemanuel.com
Andrew M. Holmes (Bar No. 260475)
drewholmes@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:   (415) 875-6600
Facsimile:    (415) 875-6700

*Attorneys for AliveCor, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AliveCor, Inc.,<br><br>             Plaintiff,<br><br>     vs.<br><br>Apple Inc.,<br><br>             Defendant. | CASE NO. 4:21-cv-03958-JSW<br><br>**PLAINTIFF ALIVECOR INC.'S MOTION TO STRIKE AND EXCLUDE PORTIONS OF REPORT AND TESTIMONY OF SARAH BUTLER**<br><br>Date: October 6, 2023<br>Time: 9 am<br>Place: Courtroom 5, 2nd Floor<br><br>The Honorable Jeffrey S. White |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on October 6, 2023, or as soon thereafter as this matter can be heard before the Honorable Judge Jeffrey S. White in Courtroom 5, Second Floor, United States District Court for the Northern District of California, Oakland Courthouse, 1301 Clay Street, Oakland, CA 94612, Plaintiff AliveCor, Inc. ("AliveCor") shall and hereby does move the Court pursuant to Federal Rules of Civil Procedure 26 and 37, and Federal Rule of Evidence 702 to strike and exclude portions of the report and testimony of Defendant's proffered survey expert, Sarah Butler.

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether the survey conducted by Ms. Sarah Butler should be struck pursuant to Federal Rules of Civil Procedure 26 and 37, as improper rebuttal.

2. Whether the survey conducted by Ms. Sarah Butler should be pursuant to Federal Rule of Evidence 702, due to lack of "fit" with the facts of this case.

**TABLE OF CONTENTS**

**Page**

I. PRELIMINARY STATEMENT ...................................................................................1

II. BACKGROUND ..........................................................................................................2

    A. AliveCor's Case And The Relevance Of Lock-In.........................................2

    B. Dr. Diehl's Survey.........................................................................................3

    C. Ms. Butler's Survey.......................................................................................4

III. LEGAL STANDARD ..................................................................................................5

IV. ARGUMENT ................................................................................................................6

    A. Ms. Butler's Survey Is Improper Rebuttal ....................................................7

        1. The Butler Survey Does Not Rebut Dr. Diehl's Survey Nor Try To Assess Similar Questions ..................................................................7

        2. Ms. Butler's Late-Disclosed Survey Prejudices AliveCor............................11

    B. Ms. Butler's Survey Does Not "Fit" This Case ..........................................11

V. CONCLUSION ...........................................................................................................13

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Abdo v. Fitzsimmons*,
    2020 WL 4051299 (N.D. Cal. July 20, 2020) ............................................................................. 5

*Clear-View Techs., Inc. v. Rasnick*,
    2015 WL 3509384 (N.D. Cal. June 3, 2015) ........................................................................... 11

*Daubert v. Merrell Dow Pharm., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ..................................................................................................... 6

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ................................................................................................................... 6

*Domingo ex rel. Domingo v. T.K.*,
    289 F.3d 600 (9th Cir. 2002) ................................................................................................... 13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ................................................................................................................... 3

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ..................................................................................................... 6

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ............................................................................................... 3, 12

*Fed. Trade Comm'n v. Qualcomm Inc.*,
    2018 WL 6522134 (N.D. Cal. Dec. 11, 2018) ...................................................................... 5, 6

*Fed. Trade Comm'n v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ..................................................................................................... 2

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ................................................................................................................... 6

*Gunaratna v. Dennis Gross Cosmetology LLC*,
    2023 WL 2628620 (C.D. Cal. Mar. 15, 2023) .................................................................... 7, 11

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ................................................................................................................... 6

*Maldonado v. Apple, Inc*,
    2021 WL 1947512 (N.D. Cal. May 14, 2021) ..................................................................... 6, 3

*Murray v. S. Route Maritime SA*,
    870 F.3d 915 (9th Cir. 2017) ..................................................................................................... 6

*Obrey v. Johnson*,
    400 F.3d 691 (9th Cir. 2005) ................................................................................................ 6

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    2019 WL 4780183 (N.D. Cal. Sept. 30, 2019), *aff'd*, 20 F.4th 466 (9th Cir. 2021) ........................................................................................................................... 10

*Testone v. Barlean's Organic Oils, LLC*,
    2021 WL 4438391 (S.D. Cal. Sept. 28, 2021) .................................................................. 6, 3

*Vu v. McNeil–PPC, Inc.*,
    2010 WL 2179882 (C.D. Cal. May 7, 2010) .............................................................. 5, 7, 11

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001) .............................................................................................. 5, 11

**Other Authorities**

Federal Rule of Civil Procedure 26 ................................................................................................ 1, 5

Federal Rule of Civil Procedure 37 ................................................................................................ 1, 6

Federal Rule of Evidence 401 ............................................................................................................ 6

Federal Rule of Evidence 402 ............................................................................................................ 6

Federal Rule of Evidence 702 ............................................................................................................ 6

## I. PRELIMINARY STATEMENT

An entire body of law exists concerning Ms. Sarah Butler's survey opinions. Not about survey experts generally, but about Ms. Butler specifically. That body of law reflects that Ms. Butler's *modus operandi* is to take on as many matters as possible (at least 114 in the past four years), offer a survey of questionable methodology and tenuous connection to the case, connect that survey to a conclusion through *ipse dixit*, and then be excluded for doing, well, all of the above. Like those courts, this one should similarly reject the survey and associated opinions Ms. Butler offers for Apple in this case.

Ms. Butler conducted the survey in question in late April and early May 2023, ostensibly as part of a rebuttal report to AliveCor's own survey expert, Dr. Kristin Diehl. Dr. Diehl's survey—which is one piece of evidence supporting AliveCor's allegations that Apple Watch consumers are "locked-in" to watchOS app aftermarkets following their purchase—focused on what Apple Watch users thought about when they purchased their device, and specifically explored to what extent they thought about Apple's ability to exclude and/or cripple third-party watchOS apps.[1] In contrast, Ms. Butler's "rebuttal" survey explored, *inter alia*, whether survey respondents (current Apple Watch users who met certain qualification criteria) previously owned any other Apple devices, whether they previously owned any other types of smartwatch or fitness tracker, and whether they ever paid for an app or a subscription on an app made "exclusively for use on an Apple Watch." This "rebuttal" survey and the conclusions she draws from it suffer from both a procedural and substantive problem.

*First*, Ms. Butler's survey does not rebut Dr. Diehl's survey, and therefore must be stricken pursuant to Federal Rules of Civil Procedure 26 and 37. Ms. Butler conceded her survey does not address the same subject matter as Dr. Diehl's survey and asks fundamentally different questions. Indeed, her survey exists in a separate section of report from her *actual* rebuttal of Dr. Diehl, and it

---

[1] If they thought about them at all, consumers considered these issues the least of all possible options, supporting numerous other pieces of evidence that consumers are insufficiently aware of how their choices in the market for smartwatches affect their freedom to shop in the market for watchOS apps (and, thus, get locked into watchOS app aftermarkets). *See* § II.B., *infra*.

-1-

asks about topics Dr. Diehl did not even remotely explore with her own survey (*e.g.*, how often Apple Watch users pay for apps or app subscriptions). Apple's failure to disclose Ms. Butler's survey in a timely fashion deeply prejudices AliveCor, because AliveCor has no opportunity to offer rebuttal expert testimony or analyses to these late-disclosed opinions under the case schedule. This unfortunately continues a trend of Apple failing to disclose relevant information to AliveCor in a timely manner. *See* Dkt. 182 at 9 ("Instead of explaining the delay in disclosure, Apple maintains it was entirely forthcoming with AliveCor and Judge Kim about Cha's emails … This argument is unconvincing … The Court is troubled by the lack of candor exhibited by Apple and its counsel[.]").

*Second*, Ms. Butler's survey and related conclusions do not meet even the minimal requirements of the *Daubert* standard. She asks a series of questions about how many and what type of electronics consumers own, and then leaps from that limited data to the conclusion that consumers are aware Apple can alter its operating system to exclude competitors. She offers no reasoning for that connection beyond *ipse dixit*. Accordingly, Ms. Butler's survey should be excluded under *Daubert* as well.

## II.   BACKGROUND

### A.   AliveCor's Case And The Relevance Of Lock-In

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'" *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (internal citation omitted). This case has always focused on Apple's anticompetitive conduct in the (after)market for watchOS heart rhythm analysis applications ("HRA apps"). *See generally* Dkt. 106; *see also* Dkt. 42 at 1.[2] Specifically, AliveCor alleges that Apple's heartrate algorithm change in watchOS 5 was anticompetitive because it rendered third parties incapable of offering competing watchOS HRA apps. Dkt. 106 ¶¶ 7, 29, 84-89; *see also* Dkt. 42 at 15 ("AliveCor alleges that … the purpose and effect of [Apple's heartrate algorithm] update was to

---

[2] Since the parties first briefed the motion to dismiss, AliveCor updated its description of the relevant market from "heart rate analysis apps" to "heart rhythm analysis apps," because the latter is a more accurate term of the app's function. The fundamental contours of the market, however, remain the same.

prevent third parties from identifying irregular heart rate situations and from offering competing heart rate analysis apps."). As such, AliveCor has always alleged that Apple commands one hundred percent of the market for HRA apps on watchOS devices based on Apple's complete control over both watchOS and distribution for watchOS apps. Dkt. 1 ¶ 52; *see also id.* ¶¶ 8, 53. AliveCor has also always alleged Apple's monopoly power over Apple Watch users in the aftermarket based on, *inter alia*, high switching costs and consumer lock-in. *See id.* ¶¶ 58-69.

A "crucial" element of this analysis is that aftermarket restrictions were not "generally known" by foremarket consumers before their purchase, because such lack of knowledge leads to "lock-in." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 976–77 (9th Cir. 2023) (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 477 n.24, 486 (1992)).

AliveCor's economic expert, Dr. Michael Cragg, evaluated the relevant market according to long-accepted analytical frameworks, including, *inter alia*, the Hypothetical Monopolist Test ("HMT"), a SSNIP test,[3] *Brown Shoe* practical indicia factors, special considerations for aftermarkets, and Apple's own concessions about market definition. Cragg Rpt. § I.V.A; *see also Epic*, 67 F.4th at 975-76 (endorsing SSNIP, *Brown Shoe,* and aftermarket analyses). Applying those frameworks, Dr. Cragg opined that the relevant market in this case is watchOS HRA apps. Ex. 1[4] (Cragg Rpt.) ¶ 100.

B.  **Dr. Diehl's Survey**

Dr. Kristin Diehl conducted a survey in aid of analyzing whether Apple Watch purchasers can be locked into watchOS aftermarkets. She did so by analyzing whether, at the time of their Apple Watch purchase, consumers considered Apple's power to exclude third party apps. Specifically, her main survey, which asked just two questions, "measured how much respondents [who currently use an Apple Watch purchased in the past six months] thought about a set of features when deciding on their Apple Watch." Ex. 2 (Diehl Rpt.) ¶ 18. In designing her survey, Dr. Diehl

---

[3] "SSNIP" stands for a small but significant and non-transitory increase in price. Ex. 1 (Cragg Rpt.) ¶ 76. The tool is commonly used by economists when performing an HMT. *Id.*

[4] In this memorandum, "Ex. __" refers to the exhibits attached to the Declaration of Krishna Shah filed herewith.

-3-

1 reviewed Apple's ▮▮▮▮▮▮
2 which ▮▮▮▮▮▮
3 ▮▮▮▮▮▮
4 ▮▮▮ Ex. 2 (Diehl Rpt.) ¶ 39. Dr. Diehl's questions included thirteen features: ▮▮
5 ▮▮▮▮▮▮ two that
6 concerned Apple's ability to restrict access to third party apps, and one final feature designed to
7 mask the purpose of the survey. *Id*. ¶¶ 40, 41. Her results showed that consumers uniformly thought
8 about Apple's power over third party apps *least* of all the offered features, if they even thought about
9 the issue at all. *Id.* ¶¶ 66, 74.

Dr. Cragg used Dr. Diehl's survey as one input in his broader analysis of lock-in, concluding that competition in the market for smartwatches would (and does) not discipline a hypothetical monopolist of watchOS HRA apps. Ex. 1 (Cragg Rpt.) § V.B. Put differently, he concluded that numerous pieces of evidence—Dr. Diehl's survey included—demonstrate lock-in and Apple's aftermarket power. *Id.* ¶¶ 154-168.

### C. Ms. Butler's Survey

On May 22, 2023, Apple served the "Rebuttal Report of Sarah Butler." Ms. Butler's "Rebuttal" Report consists of two main parts: direct critiques of Dr. Diehl's survey in a section titled "Response to the Diehl Survey" (Ex. 3. (Butler Rpt.) § VI.), and a survey of Ms. Butler's own in a section titled "Butler Survey" (*id.* § VII.) concerning four subject areas other than Apple Watch owners' knowledge or thought process when they purchased an Apple Watch: (1) "what devices (including non-Apple brands) they own and have used," (2) "how satisfied they are with their Apple Watch," (3) "what types of apps they use on their Apple Watch," and (4) "the extent to which Apple Watch owners have paid for an app and/or paid for a subscription in order to use certain features of an app to be used on their device." *Id.* ¶ 50. AliveCor will address the Diehl critiques at trial. This motion addresses only the Butler Survey and associated opinions.

Ms. Butler repeatedly confirmed her report only rebuts Dr. Diehl's Report, and Dr. Cragg's reliance on Dr. Diehl's report. *See, e.g.*, Ex. 4 (Butler Tr.) at 9:21-10:20 (Q: "And are you responding to any other experts' opinions in this case?" A: "In terms of providing like a direct

written response? No. It's really to Dr. Diehl and Dr. Cragg's reliance on Dr. Diehl that I'm responding directly to in written form."); *id.* at 11:7-10 ("I'm responding most directly to Dr. Diehl, Dr. Cragg's reliance on Dr. Diehl, and then, of course, I'm presenting my own results."). Ms. Butler only reviewed Dr. Diehl's Report and paragraphs 161-168 of Dr. Cragg's Report. *Id.* at 11:12-15; 79:21-80:7. Similarly, Ms. Butler only reviewed Dr. Diehl's deposition transcript. *Id.* at 11:12-19. This is particularly problematic because Apple's damages expert also relies on Ms. Butler's survey to try to reduce AliveCor's damages estimates, even though Ms. Butler concedes her survey does not address any of AliveCor's opening damages expert opinions (none of which relied on Dr. Diehl's survey work). Ex. 5 (Serwin Rpt.) ¶¶ 155, 156; Ex. 4 (Butler Tr.) at 9:21-10:1; 11:7-10.

### III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 26, a party may submit expert testimony that is "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). Expert opinions exceeding the scope of "rebuttal" must be offered affirmatively, lest they be deemed untimely. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106-07 (9th Cir. 2001). Courts limit the scope of "rebuttal" to the "same subject matter, " which courts interpret narrowly. *Vu v. McNeil–PPC, Inc.*, 2010 WL 2179882, at *3 (C.D. Cal. May 7, 2010). However, "[e]xpert reports that simply address the same general subject matter as a previously-submitted report, but do not directly contradict or rebut the actual contents of that prior report, do not qualify as proper rebuttal or reply reports." *Fed. Trade Comm'n v. Qualcomm Inc.*, 2018 WL 6522134, at *4 (N.D. Cal. Dec. 11, 2018) (internal citation omitted). "[S]upplemental or 'rebuttal' experts, therefore, 'cannot put forth their own theories; they must restrict their testimony to attacking the theories offered by the adversary's experts.'" *Abdo v. Fitzsimmons*, 2020 WL 4051299, at *2 (N.D. Cal. July 20, 2020) (internal citation omitted). Once a receiving party shows a "rebuttal" was improper under these standards, the party offering the "rebuttal" report bears the burden to show that the belated disclosure was harmless. *Yeti*, 259 F.3d at 1106-07. Where a "rebuttal" report exceeds its permissible scope and is not harmless, the appropriate remedy is striking as untimely the offending portion of the report pursuant to Federal

Rule of Civil Procedure 37. *See Qualcomm Inc.*, 2018 WL 6522134, at *5 ("Rule 37 is a 'self-executing' and 'automatic' sanction.").

In addition to timeliness considerations, "rebuttal" opinions must also be independently admissible. Under *Daubert* and Federal Rule of Evidence 702, the trial court acts as a gatekeeper to ensure that offered expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). As to relevance, the court looks to whether the expert opinions "fit" the case at bar; "fit" is a higher bar than mere relevance under Federal Rules of Evidence 401 and 402. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995). As to reliability, the court looks to whether the expert opinion "suffer[s] from serious methodological flaws," *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005), or if "the reasoning or methodology underlying the testimony is scientifically [in]valid," *Murray v. S. Route Maritime SA*, 870 F.3d 915, 922 (9th Cir. 2017). Courts should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## IV. ARGUMENT

Ms. Butler's survey and related opinions should be excluded for at least two reasons. First, they are non-responsive to Dr. Diehl's survey, and accordingly not permissible rebuttal. Having received Ms. Butler's survey only very late in expert discovery—after its ability to submit any rebuttal reports of its own—AliveCor is prejudiced in its ability to respond and critique that survey with its own expert. Second, the opinions Ms. Butler offers based on her survey are pure *ipse dixit*.

As AliveCor noted above in its preliminary statement, this is not the first time Ms. Butler submitted a survey demonstrating either or both of these problems. Courts have excluded her survey opinions multiple times over for exactly these types of reasons. *See, e.g.*, *Testone v. Barlean's Organic Oils, LLC*, 2021 WL 4438391, at *6 (S.D. Cal. Sept. 28, 2021) (excluding Ms. Butler from opining on economics); *Maldonado v. Apple, Inc*, 2021 WL 1947512, *25-26 (N.D. Cal. May 14, 2021) (same, in a case where Ms. Butler offered testimony on behalf of Apple). Indeed, Ms. Butler so regularly offers expert testimony and is so regularly excluded under *Daubert* that one court

helpfully collected a string cite of cases in which courts have criticized, excluded, or declined to rely upon her opinions. *Gunaratna v. Dennis Gross Cosmetology LLC*, 2023 WL 2628620, at *17 (C.D. Cal. Mar. 15, 2023).

### A. Ms. Butler's Survey Is Improper Rebuttal

Ms. Butler's report is not proper rebuttal material because it vastly exceeds the scope of the subject matter of Dr. Diehl's report—indeed, it does not engage with that subject matter at all. Moreover, Apple's belated disclosure prejudices AliveCor. Accordingly, her survey should be struck. *See Vu*, 2010 WL 2179882, at *2-3 ("Because these experts' opinions go beyond the boundaries of Dr. Kelly's report, Costco's blanket characterization of Drs. Banner and Beckwith as 'rebuttal experts' is disingenuous.").

#### 1. The Butler Survey Does Not Rebut Dr. Diehl's Survey Nor Try To Assess Similar Questions

As noted previously, Ms. Butler's "Rebuttal Report" contains two parts—a rebuttal of Dr. Diehl and a survey of Ms. Butler's own. *See* Ex. 3. (Butler Rpt.) § VI, VII. The former is appropriate rebuttal material; the latter is not.

Ms. Butler's survey is simply non-responsive to Dr. Diehl's work. Dr. Diehl "design[ed] and conduct[ed] a consumer survey to assess the extent to which Apple Watch owners thought about, at the time of purchase of their Apple Watch, whether Apple could restrict their ability to use Non-Apple watchOS apps of their choice." Ex. 2 (Diehl Rpt.) ¶ 9. In comparison, Ms. Butler designed her survey to determine: (1) "what devices (including non-Apple brands) they own and have used," (2) "how satisfied they are with their Apple Watch," (3) "what types of apps they use on their Apple Watch," and (4) "the extent to which Apple Watch owners have paid for an app and/or paid for a subscription in order to use certain features of an app to be used on their device." Ex. 3 (Butler Rpt.) ¶ 50. Facially, the two surveys cover different material. Indeed, Ms. Butler *admitted* that "[her] survey wasn't specifically limited to be a response to Dr. Diehl and Dr. Cragg. I mean, I think there are some other issues or questions I cover in the survey." Ex. 4 (Butler Tr.) at 13:9-12.

A simple comparison of the two surveys illustrates that Ms. Butler's survey shares no common ground with Dr. Diehl's. Apart from non-substantive screening questions, the two surveys

have no overlap. Dr. Diehl asked *two* questions, both about Apple Watch owners' thoughts at the time of deciding to acquire an Apple Watch. Ex. 2 (Diehl Rpt.), Appendix D. Ms. Butler asked *sixteen* questions, *zero* of which are bear on Apple Watch owners' pre-acquisition thoughts, and several of which (*e.g.*, Questions 11-15) do not bear on the users' initial purchase at all and instead focus on post-purchase actions. Ex. 3 (Butler Rpt.), Ex. F.

| DR. DIEHL'S SURVEY | MS. BUTLER'S SURVEY |
|---|---|
| **Question Text** (omitting definitions, instructions, selection options, etc.) ||
| 1-10: Screening Questionnaire | S1-S14: Screening Questionnaire |
| 11-12: Main Questionnaire | Q1-16: Main Questionnaire |
| 11. Below is a list of features of the Apple Watch. For each feature, please choose 'Yes" if you gave any thought to this feature, or please choose "No" if you did not think about this feature when you were deciding to get your Apple Watch. | 1. Please indicate which model(s) of Apple Watch you have owned but no longer use or currently own and use. |
| | 2. When did you get the Apple Watch you currently use? |
| | 3. How did you obtain the Apple Watch that you currently use? |
| | 4. Why did you want an Apple brand smartwatch? |
| | 5. Any other reasons? |
| 12. You indicated that you thought about the following feature(s). Select one response per feature to indicate how much you thought about this feature at the time you decided on your Apple Watch. | 6. How satisfied are you with your Apple Watch? |
| | 7. What makes you say you are [INSERT RESPONSE FROM Q6] with your Apple Watch? |
| | 8. You indicated that you also own [INSERT FROM S11] brand(s) of smartwatch(es). Which brand do you use most often? |
| | 9. Prior to getting your current Apple Watch, did you consider any other brand(s) of smartwatch(es)? |
| | 10. If you recall, what other brand(s) of smartwatch(es) did you consider? |
| | 11. Which of the following type(s) of apps do you use on your Apple Watch? |

| | |
|---|---|
| | 12. Have you ever downloaded a paid app (i.e., an app that costs more than $0.00) specifically for use on your Apple Watch? |
| | 13. If you recall, what type(s) of apps that you paid for have you downloaded for your Apple Watch? |
| | 14. Have you ever downloaded an app specifically for use on your Apple Watch that required a subscription in order to use certain features? |
| | 15. If you recall, what type(s) of app(s) offering a subscription for certain features have you downloaded for your Apple Watch? |
| | 16. Do you or do any members of your household work for any of the following? |

Ms. Butler conceded at deposition that Dr. Diehl never asked any questions nor offered any opinions concerning Apple Watch owners' (1) range of devices "own[ed] and [] used," (Ex. 3 (Butler Rpt.) ¶ 50; Butler Q1-3, Q8-10; Ex. 4 (Butler Tr.) at 45:19-21 (Butler: "I don't think [Dr. Diehl] asks a question about how many devices one has owned"); see also id. at 46:15-19); (2) "satisfaction" with their Apple Watch, (Ex. 3 (Butler Rpt.) ¶ 50; Butler Q4-7); (3) apps used on their Apple Watch (Ex. 3 (Butler Rpt.) ¶ 50; Butler Q11); or (4) "pa[yment] for an app and/or pa[yment] for a subscription in order to use certain features of an app to be used on their device," (Ex. 3 (Butler Rpt.) ¶ 50; Butler Q12-15; Ex. 4 (Butler Tr.) at 72:25-73:8 (Q: "[W]hen you get to questions 11 through 15, the substance of the survey, what portions of Dr. Diehl's report or survey are you responding to?" A: "Well, I don't know that Q 11 through [] Q 15 are necessarily a direct response to something in Dr. Diehl's actual questionnaire."); 73:16-21 (Q: "[W]hat is it rebutting from her report or her opinions?" A: "Again, I don't know that it's in a specifically limited to a rebuttal to her survey questions."). And Ms. Butler asked no questions regarding what consumers "thought about" at the time of their Apple Watch purchase, or otherwise asked a single question that tried to assess whether consumers "generally knew" about Apple's bad practices with respect to watchOS apps as exemplified by this case. *Compare* Ex. 3 (Butler Rpt.) ¶ 50; Butler Q1-16; Ex. 4 (Butler Tr.) at 51:15-52:10 (Q: "[D]oes your survey in any way provide information derived from survey responses to your question about what people did or did not know about Apple's policies or practices when they bought an Apple Watch?" A: "So if your question is simply did I ask

Case 4:21-cv-03958-JSW    Document 278-25    Filed 12/20/23    Page 16 of 20

respondents the question, what did you know about Apple policies when you bought the watch, that's not a question I asked, and I don't think that that would generate reliable results." Q: "So you would have [] come at it a little differently than just asking it straightforward like that?" A: "I certainly don't think you would get data that would be helpful if you asked people what was in your head or what did you know at the time you were making a purchase in terms of policies."); 61:24-62:7 (Q: "In your survey, you did not ask and you do not think you could ask survey respondents what they did or did not know about Apple's policy or practices with respect to third-party apps?" A: "I did not ask that question directly as part of my survey."); 66:7-16 (Q: "you and your surveyors didn't ask about any familiarity with specific policies or practices of Apple at the time of respondents' purchase, right?" A: "And, again, if you're asking did I ask a specific question as to what did you know about Apple's policies at the time you made your purchase, that's not a question I asked, and I don't think that kind of question or question formulated in that way would have generated reliable results"); *with* Ex. 2 (Diehl Rpt.) ¶9; Diehl Q11-12.

   The two surveys simply do not speak to one another, which is a fundamental problem for Ms. Butler, given that she contends her survey is a rebuttal to Dr. Diehl. *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 2019 WL 4780183 (N.D. Cal. Sept. 30, 2019) ("Mr. Redman's opinions simply do not concern the same subject matter as Dr. Sasian's testimony."), *aff'd*, 20 F.4th 466 (9th Cir. 2021).

   Nor does Ms. Butler draw any *conclusions* from her survey that contradict Dr. Diehl's own. Dr. Diehl concludes that "[her] results indicate that the Non-Apple Features [*i.e.*, indications of Apple's power over Apple Watch purchasers with respect to watchOS apps] received the least thought among all of the features Apple Watch owners were asked about." Diehl Rpt. ¶ 74.[5] Ms. Butler, meanwhile, concludes that Apple Watch owners have owned previous Apple products, Ex. 3 (Butler Rpt.) ¶ 89; sometimes own non-Apple products, *id.*; generally like their Apple

---

[5] Relying in part on Dr. Diehl's survey, Dr. Cragg concludes that "consumers think relatively little about how their smartwatch choice affects their freedom to shop in the market for watchOS apps," which informs his opinions regarding consumer lock-in. *See* Cragg Rpt. ¶¶ 154-168, § V.C.3.a.

-10-
MOTION TO STRIKE AND EXCLUDE PORTIONS OF
REPORT AND TESTIMONY OF SARAH BUTLER

products, *id*. ¶ 90; and do not pay for app subscriptions regularly, *id*. ¶ 91; *see also id*. ¶9. Whatever the merit of these conclusions, they have nothing to do with what consumers thought about at the time of their Apple Watch purchase. Instead, each conclusion is apparently intended to contradict AliveCor's broader case-in-chief, *not* Dr. Diehl. C*lear-View Techs., Inc. v. Rasnick*, 2015 WL 3509384, at *4-5 (N.D. Cal. June 3, 2015) (excluding a rebuttal expert for being non-responsive, except as to plaintiffs' broader case-in-chief).

### 2. Ms. Butler's Late-Disclosed Survey Prejudices AliveCor

Apple bears the burden of proof to show that its belated disclosure does not prejudice AliveCor. *Yeti*, 259 F.3d at 1107. Apple cannot meet that burden. The parties' expert discovery schedule does not permit AliveCor to serve reply expert reports, responsive to Apple's rebuttal reports. *See* Dkt. 174. Nor can the existing schedule be modified at this point to accommodate a responsive report from Dr. Diehl or any other of AliveCor's experts impacted by the Butler survey (including AliveCor's economics and damages experts). *Id*. As a result, AliveCor has no opportunity to present evidence in response to Ms. Butler's survey. "This is a hornbook example of sandbagging, a litigation tactic this Court [should] not tolerate." *Vu*, 2010 WL 2179882, at *3.

### B. Ms. Butler's Survey Does Not "Fit" This Case

Apart from Apple's late disclosure, Ms. Butler's survey suffers from fundamental defects requiring exclusion under the *Daubert* standard. In particular, Ms. Butler's survey provides no support for her core conclusions, requiring her to rely on her own say-so for her opinions. Accordingly, her survey is not admissible under *Daubert*. *Gunaratna*, 2023 WL 2628620, at *15-18 (excluding Ms. Butler's opinions because, *inter alia*, her survey did not "actually test[] Plaintiffs' theory of the case").

Ms. Butler's survey purports to show "that Apple Watch users have owned many Apple devices." Ex. 3 (Butler Rpt.) ¶ 77, Table 5. She offers these results to suggest that Apple Watch owners are "familiar with Apple products." *Id*. From this supposed familiarity, Ms. Butler concludes and intends to opine that consumers know about Apple's ability to impose restrictions on watchOS developers when they purchase their Apple Watches. *Id*. ¶ 78. Ms. Butler's logic is (1) Apple Watch

purchasers have owned multiple Apple products, so (2) they necessarily know and must have internalized Apple's practices regarding third party app developers.

The analytical gap between Ms. Butler's *results* and her *conclusions* is unsupportable. *First*, the observation that Apple Watch users own multiple Apple products says nothing about this case. Apple Watch owners *must* own at least one Apple product—an iPhone—to set up their Apple Watch. Cragg Rpt. ¶ 138. But mere ownership of Apple products says nothing about what Apple Watch owners *know* about Apple's restrictions of competition in any app market dependent on watchOS. *Epic Games*, 67 F.4th at 977-78 (relevant inquiry is how many consumers are ignorant of aftermarket restrictions). Indeed, Apple's economics expert, Dr. Lauren Stiroh, testified she does *not* claim consumers were generally aware of Apple's ability to restrict watchOS app competition in this way.[6] And she was unaware of any evidence indicating as much—a strong condemnation of the opinions that Ms. Butler claims, without support, derive from her survey. *Id.*

*Second*, and in any event, to the extent that Ms. Butler claims her survey responses generally reflect consumer awareness about Apple's ability to restrain aftermarket competition, *see* Ex. 3 (Butler Rpt.) ¶¶ 77-78, that opinion lacks any analysis. Relying merely on her own statement that ownership breeds familiarity, Ms. Butler concludes Apple Watch purchasers did not "think[] about" aftermarket restraints when they purchased their Watches because they already knew of those restraints. *Id*. ¶ 78. She performed no analysis on that question. *See, e.g.*, Ex. 4 (Butler Tr.) at 44:22-45:12; 46:9-47:2; 47:21-48:9. Nor does she have any training in consumer decision-making behavior, unlike Dr. Diehl. Ex. 3 (Butler Rpt.), Ex. A; Ex. 2 (Diehl Rpt.) ¶ 2 (Dr. Diehl has a Ph.D in Marketing). Nor is she trained in any branch of economics that would allow her to reach this conclusion. *See* Ex. 3 (Butler Rpt.), Ex. A. Indeed, Ms. Butler **regularly** offers opinions divorced

---

[6] *See* Ex. 6 (Stiroh Reb. Tr.) at 323:11-324:9 ("Q. Sure. Are you opining in this case that consumers are generally aware that Apple can and does change algorithms to render third-party apps unusable? A. I am not opining that consumers are generally aware of that if it does occur. Q. Okay. Are you opining that consumers are generally aware of the ways in which Apple changes algorithms in the background of watchOS? A. I am not opining on that, no. Q. Are you aware of any evidence that consumers even have access to the information about how and to what extent Apple changes algorithms in the background of watchOS? A. Am I aware if they have access to information on the extent to which and how they do it? Was that your question? Q. Yes. A. I am not opining that they have access to that information, no.").

-12-

from her own expertise, including for Apple, and has been excluded for doing so. *See, e.g.*, *Testone*, 2021 WL 4438391, at *6 (excluding Ms. Butler from opining on economics); *Maldonado*, 2021 WL 1947512, at *25-26 (same, in a case where Ms. Butler offered testimony on behalf of Apple). It bears noting that Ms. Butler has testified at least 114 times in the past four years, indicating her business model is about volume, not quality. *See* Ex. 3 (Butler Rpt.), Ex. A. At bottom, like countless cases before this one, Dr. Butler's opinions about consumer knowledge are pure *ipse dixit*, and should therefore be excluded. *See Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002).

*Third*, and for similar reasons, Ms. Butler's conclusions regarding "how satisfied [consumers] are with their Apple Watch," "what types of apps they use on their Apple Watch," and "the extent to which Apple Watch owners have paid for an app and/or paid for a subscription in order to use certain features of an app to be used on their device" should be excluded. Ex. 3 (Butler Rpt.) ¶ 50. Whether consumers are satisfied with their Apple Watch has no bearing on this case, which concerns Apple's decision to restrict access to HRPO-generated heart rates in a way largely invisible to consumers, but which eliminated competition for watchOS HRA apps. *See* Motion to Exclude Expert Opinion of Lauren Stiroh, filed concurrently, at 1.

## V. CONCLUSION

For the foregoing reasons, Ms. Butler's survey should be excluded, either because it is improper rebuttal material or because it lacks "fit" and methodological soundness under *Daubert*.

| | |
|---|---|
| DATED: June 29, 2023 | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| | By  /s/ *Adam B. Wolfson*  <br>Sean Pak <br>Adam B. Wolfson <br>Andrew M. Holmes |
| | *Attorneys for Plaintiff AliveCor, Inc.* |